THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, Appellant, *v.* HENRY HART et al., Respondents.

The grant made in 1666 by Governor Nicolls, to the freeholders and inhabitants of Harlem, of a tract of land extending eastward to " Harlem Ryver or any part of the said Ryver on which this island doth abutt," only conveyed to high-water mark.

By the Dongan charter of 1686 the city of New York acquired title to the tideway or land between high and low-water mark in front of said tract. That title in its origin was absolute, and was unburdened with any pre-emptive privilege amounting to a legal right in any one.

The pre-emptive right to the lands under water in front of the tideway given to the owners of adjacent lands by the act of 1852 (§ 4, chap. 285, Laws of 1852), by which said lands were granted by the State to the city, was only given to the city's grantees of the tideway, save, at least, in the case of an upland owner, in front of whose land there was no tideway.

While, however, the owners of the uplands had no pre-emptive right in · the adjacent tideway by force of said statute, they had an equitable claim to priority of purchase, which was recognized and protected by the city, and upon acceptance of the terms and conditions proposed by the city authorities they became "legally entitled" to a deed within the meaning of the provision of the Sinking Fund Ordinance, passed by the city in 1844 (§ 11, title 4), and recognized and adopted by the State in 1845 (§ 5, chap. 225, Laws of 1845), which authorized the comptroller "in all cases of grants of land under water" to "issue a grant   *   * to the party legally entitled thereto," upon his paying or securing the price fixed as specified therein.

Accordingly *held*, that a deed, given upon payment of the price so fixed by the comptroller, to the owner of the adjacent upland, of part of said tideway and adjoining land under water was valid, although given without a sale at public auction and without twenty days' previous notice, as required by said ordinance (§ 17), in case of sale of real estate belonging to the corporation, in which no one has a pre-emptive right or equitable claim to a preference.

*It seems* that said provision did not authorize all of the city's lands under water to be sold at private sale, but the authority to sell in that manner was limited exclusively to cases in which a pre-emptive right or just ground of preference existed.

(Argued March 12, 1884; decided April 15, 1884.)

APPEAL from judgment of the General Term of the Supreme Court, in the first judicial department, entered upon an order made December 13, 1878, which affirmed a judgment in favor of defendants, entered upon a decision of the court on trial without a jury.

This was an action of ejectment to recover possession of a piece of land in the city of New York, lying between the original high-water mark of the Harlem river and the bulkhead line in said river.

The material facts are stated in the opinion.

*D. J. Dean* for appellant. The plaintiff derived title in fee to that part of the premises comprised by the shore, *i. e.,* the strip between high and low-water mark, under the Dongan Charter of April 27, 1686. (*Firman* v. *Mayor,* 5 Sandf. 16 ; 6 Seld. 567 ; *Langdon* v. *Mayor,* 93 N. Y. 134 ; *Towle* v. *Remsen,* 70 id. 303 ; *Wendell* v. *People,* 8 Wend. 188 ; *Commissioners* v. *Kimpshall,* 26 id. 410.) A grant bounded by a river goes only to high water, and not beyond. (3 Kent's Com. marg. pp. 427, 431, 432, 545, 546 ; *People* v. *Tibbets,* 19 N. Y. 523–527 ; *Ex parte Jennings,* 6 Cow. 528 ; *People, ex rel. Tibbets,* 5 Wend. 443, 446 ; *Jackson* v. *Reeves,* 3 Caines, 295 ; *Canal Commrs.* v. *People,* 5 Wend. 459 ; 2 Roll. 186 ; L. 28 ; id. 3, 4 ; Comyn's Dig., title Grant, G. 7, 12 ; id. title 3 M. 37 ; *Lansing* v. *Smith,* 4 Wend. 20, 21, 22, 23 ; *Gould* v. *H. R. Co.,* 6 N. Y. 540, 541, 542 ; 2 Blackst. Com. 347 marg.) It was proper to consider the circumstances existing at the time and under which the patents were issued. (*Knapp* v. *Warren,* 57 N. Y. 658 ; *Ex parte Jennings,* 6 Cow. 518 ; 1 Doc. His. of N. Y. 598, 599, 606, § 6.) The purpose of organizing the village of Harlem was to save the agricultural interests and promote the security of the upper part of the island, and not to interfere with or supersede the greater city (which included the lesser village) in its commercial interests or advantages. (Laws and ordinances of New Netherlands, 335 ; 1 Doc. History of N. Y. 182.) The title of the city to that portion of the land which is in the Harlem river, between the line of low water and the permanent exterior line, is absolute, unincumbered by any pre-emptive right available to defendants. (Laws of 1852, chap. 285, p. 420 ; *Towle* v. *Remsen,* 70 N. Y. 303 ; Dongan Charter, §§ 3–14 ; Montgomery Charter, § 37 ; Laws of 1807, chap. 115.) The grant to the defendants by the city, by direction of the commissioners of the sinking fund, is void, and confers no title upon them. (Laws of 1870, chap. 137, §§ 105, 116, p. 392 ; Laws of 1826, chap. 58, § 1 ; Act of April 3, 1807, § 15 ; Laws of 1837, chap. 182, p. 163 ; Laws of 1853, chap. 217, § 7, p. 411 ; Laws of 1857, chap. 446, § 41, p. 888.) Since the deed

made by direction of the commissioners of the sinking fund was "*ultra vires,*" it is absolutely void and cannot avail to estop the plaintiff. (R. 2 Roll. 191, L. 20; Comyn's Dig., Patent F, 1; 2 Term R. 171; *Doe Defreecu* v. *Howell,* 27 Eng. Com. Law, 311; 2 B. & Ad. 744; *Chandler* v. *Ford,* 30 Eng. Com. Law, 301; *Jackson* v. *Stanley,* 10 N.Y. 138; *People* v. *Van Rensselaer,* 9 id. 320; *Jackson* v. *Lawton,* 10 Johns. 23; *Jackson* v. *Hart,* 12 id. 77; *Jackson* v. *March,* 6 Cow. 281; *Livingston* v. *People,* 8 Barb. 255, 256; *Toole* v. *Parmer,* 1 Abb. [U. S.] 102; *Bogardus* v. *Trinity Church,* 4 Sandf. Ch. 735; *People* v. *Moran,* 5 Denio, 400; *Osterhouse* v. *Shoemaker,* 3 Hill, 517; *William* v. *Jackson,* 5 Johns. 504, 505; *Livingston* v. *Penn Iron Co.,* 9 Wend. 520; *Humbert* v. *Trinity Church,* 24 id. 637; *Van Deusen* v. *Sweet,* 51 N. Y. 384, 387; *Lyons* v. *Chamberlain,* 88 id. 587; *McDonald* v. *Mayor,* 68 id. 23; *Hodges* v. *Buffalo,* 2 Denio, 110; *Donovan* v. *Mayor,* 33 N. Y. 291; *Smith* v. *Mayor,* 10 id. 538.) No adverse possession against the city is shown in the case which can bar the title of plaintiff or prevent judgment for it. (*Becker* v. *Van Amburgh,* 29 Barb. 323; *Doolittle* v. *Tice,* 41 id. 182; *Corning* v. *Troy Iron Co.,* 34 id. 529; *Jackson* v. *Halstead,* 5 Cow. 216; *Brant* v. *Ogden,* 1 Johns. 158; *Lane* v. *Gould,* 11 Barb. 256; *Miner* v. *City of N. Y.,* 37 S. C. 199; *Livingston* v. *Peru Iron Co.,* 29 Wend. 116; *Wheeler* v. *Spinola,* 54 N. Y. 387; *McFarland* v. *Kerr,* 10 Bosw. 256; *Evans* v. *Turnbull,* 2 Johns. 313; *Smith* v. *Levinus,* 4 Seld. 472; *Jackson* v. *Camp,* 1 Cow. 610; *Livingston* v. *Peru Iron Co.,* 9 Wend. 516; *Frombois* v. *Jackson,* 8 Cow. 595; *Brand* v. *Ogden,* 1 Johns. 158; *Miller* v. *Platt,* 5 Duer, 272; *Cornelius* v. *Gibberson,* 25 N. J. 31, 32; *Hawk* v. *Lanseman,* 6 S. & R. 21; *Proprietors of the Kennebeck* v. *Coll.,* 1 Mass. 483; *Smith* v. *Hosmer,* 7 N. H. 441; 4 Am. Law Reg. 1269.) Payment of taxes is no evidence of adverse possession. (*Kerr* v. *McFarland,* 10 Barb. 249; *Rose* v. *Klinger,* 8 W. & S. 178, 180; *Cornelius* v. *Gibberson,* 23 N. J. 36; *Negley* v. *Albright,* 4 Whart. 291; *Sober* v. *Willing,* 10 Watts, 141; *Jackson* v. *Sharpe,* 9 Johns. 167.) If

a person in possession admits title in the true owner, he is estopped from setting up adverse possession. (*Brady* v. *Begum*, 38 Barb. 533 ; *Mitchell* v. *Walker*, 2 Aitk. 266 ; *Jackson* v. *Creeden*, 2 Johns. Cas. 353 ; *Jackson* v. *Brittan*, 4 Wend. 511; *Jackson* v. *Speer*, 7 id.. 401 ; *Jackson* v. *Crary*, 12 id. 427 ; *Enfield* v. *Day*, 7 N. H. 457 ; *Jackson* v. *Wood-ruff*, 1 Cow. 381 ; *Crary* v. *Goodman*, 22 N. Y. 173, 174, 175 ; *N. Y. C. R. R.* v. *B. & N. Y. E. C. R. Co.*, 49 Barb. 504, 505 ; Co. Litt. 121 B.; *Harris* v. *Elliott*, 10 Peters, 54 ; *Jackson* v. *Hathaway*, 15 N. Y. 454 ; *Leonard* v. *White,* 7 Mass. 8, 9 ; 2 Roll. 186, p. 25.)    The order of the Supreme Court confirming the report of the commissioners to open and regulate streets and avenues is not a judgment affecting such title. (*Mayor of N. Y.* v. *Colgate*, 12 N. Y. 155, 156 ; *Fisher* v. *Mayor, etc., of N. Y.*, 57 id. 349 ; *Spears* v. *Mayor*, 87 id. 359 ; 2 Hoffman's Laws, relating to the city and county of New York, 826 ; *Embury* v. *Conner*, 3 N. Y. 523 ; *Shepley* v. *Abbott*, 42 id. 451, 457 ; Co. Litt. 295 b ; 5 Vin. 380 [y] pl., 5 S. P.)    The contention that this action cannot be maintained unless the plaintiff first offers to return the money which it has received and demands the rescission of the deed is not well founded.    (*Caulkins* v. *Isabell*, 20 N. Y. 147 ; *Mickles* v. *Dillange*, 17 id. 83 ; *Putnam* v. *Ritchie*, 11 Paige, 390 ; *Bissell* v. *Kellogg*, 60 Barb. 632.)

*John E. Parsons* for respondents.    The defendants derived title to that part of the premises in question comprised by the shore, *i. e.*, the strip between high and low-water mark under the original Harlem patents, and became thereby pre-emptively entitled to the rest of the premises in question.    (*Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522; Hale's De Jure Maris, chap. 4 ; Mr. Sergeant Mereweather's speech in *Attorney-General* v. *London, Hall Sea Shore*, appen. ; Angell on Tidewaters, 224, 226, 236, 276 ; *Storer* v. *Freeman*, 6 Mass. 438 ; 1 Pick. 186 ; 8 Greenleaf, 83 ; *Hart* v. *Hill*, 1 Wharton, 135 ; *Wilson* v. *Forbes*, 2 Dev. 37 ; Acts of 1745, chap. 9 ; 11 Grattan, 74 ; *Peck* v. *Lockwood*, 5 Day, 22.)    These Harlem patents were

not only made at a time when it was generally held in the colonies that a grant on the sea conveyed to low-water mark, but the language of the grant has that effect. (*Ex parte Jennings*, 6 Cow. 518; Angell on Tidewaters, 67; Hale's De Jure Maris, chaps. 4, 5; *Child* v. *Starr*, 4 Hill, 369; *Halsey* v. *McCormack*, 13 N. Y. 297; *Killingworth* v. *Ground*, 5 Whart. 489; *Commonwealth* v. *Show*, 14 S. & R. 13; *Lapish* v. *Bangor B'k*, 8 Me. 85; *Martin* v. *Waddell*, 16 Peters, 414; *Langdon* v. *Mayor, etc., of N. Y.*, 85 N. Y. 129, 144.) But even if it be held that the shore belongs *prima facie* to the sovereign, it may belong to the subject as part of the land adjacent, and this by prescription as well as grant. (Hale's De Jure Maris, chaps. 4, 5, 6; *Commonwealth* v. *Charleston*, 1 Pick. 180; *Chapman* v. *Kimball*, 9 Conn. 38; *Beaufort* v. *Swansea*, 3 Exch. 413; *Chad* v. *Tilsea*, 2 B. & B. 403; *Coolidge* v. *Learned*, 8 Pick. 504; *Hill* v. *Smith*, 10 East, 476; *Jacobson* v. *Fountain*, 2 Johns. 170; Sanitary Rep. of New York, 345; the Secretary Von Tienhoven, "Information relating to the taking of lands in New Netherlands, 1650.") If the Harlem patents granted only to high-water mark, nevertheless the owners of the upland were by the act of 1852 (Chap. 285) entitled as such to a pre-emptive right to the lands under water in front of the shore. (Laws of 1786, chap. 67, § 18; 1 Greenleaf, 220; Act of April 3, 1807, § 15; Laws of 1815, chap. 199, § 1; Laws of 1826, chap. 58, § 1; Laws of 1850, chap. 283, § 1; *Nott* v. *Thayer*, 2 Bosw. 65; *Martin* v. *Waddel*, 16 Peters, 410; *Towle* v. *Remsen*, 70 N. Y. 303.) Even if the defendants had no pre-emptive right to the premises in question, the grant to them by the city in June, 1870, was a valid grant, lawfully vesting in them the title to the premises. (Dongan Charter, § 12; Montgomerie Charter, § 1, last clause; *Sherwood* v. *Am. Bible Soc.*, 1 Keyes, 564; *Pres. Church* v. *Mayor of N. Y.*, 5 Cow. 538; *Central Gold Co.* v. *Platt*, 3 Daly, 263; Laws of 1853, chap. 21, § 7; Laws of 1857, chap. 446, §§ 38, 41; Laws of 1870, chap. 137, §§ 105, 120; Laws of 1871, chap. 574, § 9, p. 1247.) Whether authorized or not, the plaintiff cannot dispute its own deed in this action.

(*Phillips* v. *Gorham*, 17 N. Y. 270; *Van Deuzen* v. *Sweet*, 51 id. 384; *Bradley* v. *Aldrich*, 40 id. 511; *Man* v. *Fairchild*, 2 Keyes, 111; *Hayward* v. *Buffalo*, 14 N. Y. 540; Cowp. 106; *Jackson* v. *Bull*, 1 Johns. Cas. 90; *Jackson* v. *Stevens*, 16 Johns. 110; 2 W. Black. 246; *Livingston* v. *Proseus*, 2 Hill, 528; *Jackson* v. *Dermot*, 9 Johns. 55; *Hamilton* v. *Wright*, 37 N. Y. 502; *Boole* v. *Mix*, 17 Wend. 110; *Jackson* v. *Lawton*, 10 Johns. 26; *Jackson* v. *Hart*, 12 id. 76; *People* v. *Clark*, 5 Seld. 349; *People* v. *Soc. Prop'n Gospel*, 2 Paine's C. C. 567; *Turnpike Case*, 2 Term R. 171; *Hagerty* v. *Harris*, 11 Barn. & Ald. 440; *Walton* v. *Penfield*, 3 Q. B., Ad. & El. 964 [667]; *Parish* v. *Wheeler*, 22 N. Y. 507; *Troy Nail Factory* v. *Winslow*, 45 Barb. 231; 2 R. S. [6th ed.] 1119, § 164; *People* v. *Moran*, 5 Denio, 399; *Bryan* v. *Forsyth*, 19 How. 334; *U. S.* v. *Castillero*, 2 Black, 352; *People* v. *Clark*, 5 Seld. 349; *Ogden* v. *Raymond*, 1 Keyes, 42; *Rome B'k* v. *Rome Village*, 19 N. Y. 20; *Gould* v. *Town of Sterling*, 23 id. 456; *Starin* v. *Genoa*, id. 439; *Gelpcke* v. *Dubuque*, 1 Wall. 202; *Bissell* v. *Jeffersonville*, 24 How. [U. S.] 287; 22 Conn. 502; *Palmer* v. *Lawrence*, 3 Sandf. 161.) The defendants' title to the tideway had become perfect by adverse possession before the grant by the city, and they were thus entitled under any construction of the act of 1852 to a grant of the rest of the premises in question. (*Ewing* v. *Burnet*, 11 Peters, 52, 53; *Crary* v. *Goodman*, 22 N. Y. 175; *Humbert* v. *Trinity Church*, 24 Wend. 586, 610; *McFarlane* v. *Kerr*, 10 Bosw. 249.) The city, having mapped, taxed and assessed the premises as the property of the defendants, and not the property of the city, for forty years, during which the enjoyment of the premises was of no value, and taxes were paid on the sole expectation of their future value, is now estopped from claiming the premises when they have become valuable. (*Schuchardt* v. *The Mayor*, 53 N. Y. 202; *Embury* v. *Conner*, 3 Comst. 523; *Matter of Widening Broadway*, 49 N. Y. 153; *Matter of Canal St.*, 2 Kern. 411; *Matter of Arnold*, 60 N. Y. 28; *Stafford Co.* v. *Stratton*, 2 Barn. & Ald. 526; *Hearn* v. *Rogers*, 9 B. & C. 577;

*Wendell* v. *Van Rensselaer*, 1 Johns. Ch. 353 ; *Corkhill* v
*Landers*, 44 Barb. 228 ; *Refig* v. *Butterton*, 6 Term R. 554 ;
*Laverty* v. *Moore*, 32 Barb. 350.) The city, having invited
us to deal with it in good faith, and having received and ap-
propriated and retained the consideration money, is estopped
by that alone, if not otherwise, from claiming the premises
without first offering to rescind the contract and return the
consideration. (*Sherman* v. *McKeon*, 38 N. Y. 275 ; *Bartholo-
mew* v. *Fennimore*, 17 Barb. 428 ; *Palmer* v. *Lawrence*, 3
Sandf. 170 ; *Steam Co.* v. *Wood*, 17 Barb. 382.) The grant,
by the city, to Coles gave him that part of the premises de-
scribed therein and pre-emption to all in front thereof.
(*Laverty* v. *Moore*, 33 N.Y. 662 ; *O'Donnell* v. *Kelsey*, 10 id.
419.)

FINCH, J.   That the city of New York, by the terms of the
Dongan charter, granted in 1686, acquired title to the tideway,
or land between high and low-water mark, on the whole cir-
cuit of Manhattan island, and held it as an absolute fee, has
been decided by this court. (*Furman* v. *Mayor, etc.*, 6 Seld.
567 ; *Towle* v. *Remsen*, 70 N. Y. 303 ; *Langdon* v. *Mayor,
etc.*, 93 id. 134.)   The defendant, however, asserts a prior
grant, made in 1666 by Governor Nicolls, to the free-
holders and inhabitants of Harlem of a tract extending " east-
ward to the end of the Ryver, or any parte of the said Ryver
on which this island doth abutt." If that grant ran to low-
water mark, the tideway here in question belonged to the free-
holders of Harlem, and never became the property of the city
of New York.   The general rule of construction would bound
this grant by the line of high water, and exclude the tideway.
(*Ex parte Jennings*, 6 Cow. 528 ; *People* v. *Tibbetts*, 19 N. Y.
523 ; *Langdon* v. *Mayor, etc.*, 93 id. 144 ; 3 Kent's Com.
432.)   We must assume such to have been the common law at
the date of the grant.   Two years earlier the Dutch had sur-
rendered New Amsterdam to Colonel Nicolls, who, with an
armed force, asserted the right and authority of the Duke of
York and the English government.   The common law of Eng-

land entered the city with him. It is said to be possible that the rule of construction which stops such a grant of land as this at high water arose at a later period ; that it is first found in Hale's De Jure Maris, published in 1787, and that the custom of the colonies indicated a different doctrine. But Lord HALE was born in 1609, and died in 1676, only ten years later than the Harlem patents, and his work De Jure Maris was written in an earlier part of his career. It was said on the argument of *Rogers* v. *Jones* (1 Wend. 251) that the tract remained in manuscript for more than a hundred years after it was written ; and we know from other sources that by his will its author left all his manuscripts to the library of Lincoln's Inn, and it was from the solicitor-general of the queen that HARGRAVE obtained the essay for publication. How commanding and conclusive is the authority of this work of Hale's may be understood from the learned note appended to the case of *Ex parte Jennings* (6 Cow. 536). Its authority settles the common law as it stood anterior to the Harlem grants. As to some of the colonies, the rule was changed, but on the ground of local law or usage, and not of denial of the common-law rule. (*Storer* v. *Freeman*, 6 Mass. 438.) While in Connecticut it was held that the riparian owner had a franchise to wharf out to the channel, *Simons* v. *French* (25 Conn. 352), yet in an earlier case it was distinctly said that "the doctrine of the common law is that the right to the soil of the proprietor of land on navigable rivers extends only to high-water mark ; all below is *publici juris*, in the king, in England." (*Chapman* v. *Kimball*, 9 Conn. 40.) The same concession was made in New Jersey, and their different rule founded upon local law and usage, helped somewhat by a seeming local necessity. (*Bell* v. *Gough*, 3 Zabr. 689.) We have no doubt, therefore, that the common-law rule of construction carried the Harlem grants only to high-water mark.

Assuming so much, however, it is further said that the surrounding circumstances may be considered to reach the true meaning of the grant (*Knapp* v. *Warner*, 57 N. Y. 668) ; and that they require a construction which will carry it

to low-water mark.    The principal argument is that in such a grant to a town, no motive could exist for preventing its commercial prosperity by withholding its river front.    But the interesting and careful researches of the counsel for the city demonstrate that Harlem was established as a village within the general limits of the city itself, which was meant to embrace the whole island, and that the new village or settlement was formed for the " promotion of agriculture," " the security of the island and the cattle pasturing thereon," and " the recreation and amusement of the city of New Amsterdam." (Laws of New Netherlands, 335.)    The city was to be the sea port, and for this purpose its water front was to girdle the island, while the village was meant for a rustic hamlet, whose inhabitants should own cattle rather than ships.    Without pursuing the subject in its details it is enough to say that we have discovered no adequate reason for straying from the general rule in construing the Harlem patents, and are satisfied that the river line was at high-water mark, and so the city owned the tideway.    Its title to so much of the lands in dispute as constituted the portion of the tideway adjacent to and in front of the upland owned by the defendants was thus established.

That title in its origin was absolute.    The city could sell the strip to whom it pleased, and it was unburdened with any pre-emptive privilege amounting to a legal right in any one. (*Nott* v. *Thayer*, HOFFMAN, J., 2 Bosw. 25 ; *Furman* v. *Mayor, etc.*, and *Towle* v. *Remsen, supra.*)    The only rights of pre-emption found in the statutes, attached to lands under water, granted by the State to the city outside of the tideway, but the latter remained wholly unaffected. (Act of April 3, 1807, § 15 ; Laws of 1826, § 1, chap. 58 ; Laws of 1837, chap. 182, p. 166.

The other parcel of land under water involved in this litigation was in front of the tideway and granted to the city by the State. (Laws of 1852, chap. 285.)    It constituted an extension into the river of about four hundred feet, and was vested in the city subject to a pre-emption right.    The fourth section was thus expressed : " The proprietors of all grants of land under water, or owner or owners of all lands adjacent to

those hereby granted, shall have a pre-emptive right in all grants which may be made by the said mayor, etc., if any, of the lands in front of the said lands under water *heretofore granted* by the said mayor, etc." By its literal terms it gave a pre-emptive right only to those who had previously acquired by grant from the city the tideway in their front, and so had already carried their line to low water and had become adjacent owners to the extension. Their equity was plain and was preserved. But those owning the upland in front of whom lay the absolute ownership of the city in the tideway, and who were already, or might be, cut off from the water by that ownership, had no such equity. A pre-emptive right in the extension without one in the tideway would do them no good by reason of that interposed strip, and would simply make the latter valueless to the city or its other grantee by in turn cutting off from both the water front. Only, therefore, except perhaps in a single instance, pre-emption in the extension was given to the city's grantee of the tideway. An exception might exist in the case of an upland owner in whose front there was no tideway because the shore was a perpendicular bluff and the lines of high and low water were identical. To such a case the expression in the act " owner or owners of land adjacent to those hereby granted " probably refers as a separate class of pre-emptors from " proprietors of all lands under water," although even as to such upland owners there would be difficulty in the last clause of the section. To get the least benefit from the terms of this act the defendants are obliged to ask the court to change its terms by reading the words " in front of the said lands heretofore granted *by* the said mayor" as if they had been " heretofore granted *to* the said mayor." That would be legislation. The previous act of 1826, vesting in the city exterior lands under water and giving pre-emption rights, used exactly the same language in the final clause. A pre-emptive privilege was there given to the new lands under water granted by the State in front of the lands under water " heretofore granted *by* the said mayor." It is scarcely possible that such a mistake could run through so many years and enactments

undiscovered and unchanged. And the change would be indefensible as a matter of policy. It would give the upland owner pre-emption rights in an extension which he could not reach by reason of an interposed title to the tideway, and would make the latter valueless to the city's grantee because cut off from the water front. If any injustice has been done to the upland owners it came in through the Dongan charter which made the city absolute owner of the tideway and without pre-emption rights at that time reserved to the adjacent owners. That evil had no remedy except in the will and pleasure of the city and its voluntary submission to admitted equities.

At this stage of the case the plaintiff's title was established to both parcels in controversy : to one of them absolutely and without condition ; to the other coupled only with a pre-emptive right in the grantees of the tideway adjoining it in the rear, and possibly such upland owners as had no tideway in their front.

The defendant then proved a deed of both parcels given to them by the city, and a deed of part of the tideway from the city to one Coles who conveyed to them. The plaintiffs replied that its deeds were void wholly and from the beginning, because given without a sale at public auction and without twenty days of previous notice. The further controversy is concerned with the validity or invalidity of those deeds and the rights of the parties consequent upon their execution and delivery.

The deeds were given in supposed compliance with section 11 of title 4 of the Sinking Fund Ordinance, passed in 1844, and in the succeeding year recognized and adopted by the State, and made unchangeable without the consent of the legislature, except by appropriating to the fund additional revenues. (Laws of 1845, chap. 225, § 5.) The object of this ordinance was to provide resources for the payment of the Croton water debt, and to the fund was devoted "the net proceeds of all sales of real estate belonging to the corporation when sold." The ordinance provided for two different modes of selling the real estate of the city. Lands under water were

to be valued by the comptroller and street commissioner with the concurrence of the sinking fund commissioners, to be paid for in cash or the price secured by bond and mortgage, and the deed issued by the comptroller " to the parties legally entitled thereto." (§ 11.)   But a later section (§ 17) provided for the sale of " all real estate belonging to the corporation and not in use for or reserved for public purposes," which sale was to be for cash and at auction.   While section 11 applies by its terms to " all cases of grants of land under water," its final provision authorizing a deed to " the parties legally entitled thereto," serves in a measure to restrict and limit the general language. It evidently refers to lands in which somebody had a pre-emptive right, or equitable preference as purchaser.   The general policy, in avoidance of fraud and favoritism and with a view to obtaining full value, was sales at auction upon adequate public notice.   But necessarily that policy could not apply to water grants where an adjacent owner had the right of purchase, or was to be preferred.   In such a case an auction sale would be a denial of the pre-emptive right.   But lands under water, as to which there was no pre-emption or preference, could be sold at auction and with just as much propriety and reason as any dry lands, and hence the final clause of section 11 must be held to have restricted the private sales to cases where some one had the right of purchase in preference to all others, while by section 17 lands under water not so situated and all other real estate were to be sold at auction.   The subsequent legislation confirms this construction.   In 1853 (Chap. 217, § 7) and in 1857 (Chap. 446, § 41) the mandate that the city should sell at public auction contained the following words of exception, viz.: " other than the grants of land under water to which the owner of the upland shall have a pre-emption right."   We cannot, therefore, yield to the contention that " all " sales of land under water were to be private, and are satisfied upon reflection that such mode of sale under the ordinance was confined entirely to cases in which a pre-emptive right, or just ground of preference of some kind existed.   We are thus brought to the inquiry whether the defendants had

any such just preference, since the charter of 1870, which was in force when the deed to defendants was made, expressly preserved all the powers and authority of the commissioners of the sinking fund, and itself rounded out and completed the general policy by directing that all sales made under the direction of the common council should be at public auction.

What we have already said sufficiently showed that the defendants had no pre-emption right by force of the statute of 1852. In *Nott* v. *Thayer* (2 Bosw. 31) HOFFMAN, J., expressed an opinion which was concurred in by one member of the General Term that the city's absolute ownership of the tideway was qualified and affected by its acceptance of the exterior land under water coupled with pre-emption rights, but the majority of the General Term did not concur, and the contrary was decided by this court in *Towle* v. *Remsen* (*supra*). That suggestion, therefore, will not sustain the defendants' deeds. Those deeds are void unless the defendants can be said to have had some equity or just preference in the tideway which entitled them to be preferred as purchasers.

The language of section 11 of the Sinking Fund Ordinance directing the comptroller to issue grants for lands under water "to the parties legally entitled thereto," if literally construed, would not cover the rights of pre-emptors. As such merely, they are not entitled to a deed. The city may not choose to sell. It is not bound to convey. It may fix a price which the pre-emptor will not pay, or hold the land and improve it in its own manner. Nobody is "legally entitled to a deed." The literal language, therefore, must be, as it has been, construed broadly and liberally. Thus it was said in *Towle* v. *Remsen* (*supra*) relative to the pre-emption secured by the act of 1807, and which was not limited and restricted like that of 1852, that "such pre-emptive right was not an absolute legal right to a conveyance, but an equitable claim to acquire title upon such terms as the city authorities might impose." When the person having an equitable claim to priority of purchase as thus described had agreed with the city authorities upon the terms and tendered the money or mortgage, then he became "legally

entitled to a deed." These conditions of price and payment the defendants fulfilled, and as to the tideway were "legally entitled to a deed," if they had also "an equitable claim to priority of purchase." But here we are met by the two difficulties which we have already acknowledged, and stated in their full strength : first, that no statute gave these upland owners a pre-emptive right in the tideway; and second, that the city's title was an absolute fee and an unclogged ownership. But it shocks every notion of justice and right to say that the riparian owner upon navigable water has no equities by reason of that ownership. It is a doctrine which in the learned court of a neighboring State was viewed with "consternation." (*Bell* v. *Gough,* 3 Zabr. 677.) It is a doctrine which is repudiated by the entire legislation of our own State. As early as 1786 when commissioners of the land office were appointed to care for the lands of the State and were authorized to grant lands under navigable waters, a proviso was inserted "that no such grant shall be made to any person other than the proprietor of the adjacent lands." (Laws of 1786, chap. 67, § 18.) The same provision went into the Revised Statutes with an added clause, making such grants to others void. And whenever and wherever the State has granted to the city of New York exterior lands under water, it has accompanied the grant with pre-emption rights to the adjacent owners. It is idle to say that all this has been done of pure grace, and without any equity in the abutters. There was reason for doing it, and justice in the act. Granting as has been held that the riparian owner has no legal or equitable right enforceable as such against the public right (*Lansing* v. *Smith,* 4 Wend. 9 ; *Gould* v. *H. Riv. R. R. Co.,* 6 N. Y. 538), it is nevertheless true that out of his situation upon the bank and the convenience and benefit of the water front, he suffers peculiar damage and individual injury when cut off by the public use. The nature of these privileges and conveniences which thus lie at the mercy of the sovereign, and may be taken away without compensation notwithstanding the private injury inflicted are carefully described and sketched in the dissenting opinion in the case of *Gould* (*supra*).

The State may, in virtue of its ownership of the tideway, destroy them by a use or grant for public purposes and without compensation. But the State may respect them, if it chooses, and always does so wherever the public use is consistent with the private right. The city of New York became substituted for the sovereign in the ownership of the tideway. The Dongan charter gave it for commercial purposes and for the public use. The city took it, as the crown had held it, as trustee for the public. In time the custom grew up, which reconciled the public use with the private interest, of granting portions of the tideway to individuals, but still for public purposes and as a means for the public good. The grantees were required to build docks and wharves and bulk-heads under the municipal control, and so took the place of the city in executing the public purposes of the grant. The deed to the present defendants was of that character. The adoption of this policy made it unnecessary to sacrifice the riparian owner, and it was competent for the city and became its duty to provide a mode of selling its lands under water which would accomplish the double purpose. While its right in the soil of the tideway was admitted to be absolute, yet it could, as it did, recognize and protect the easement or privilege of the riparian owner wherever such protection was not inconsistent with the public interest. Its policy of grants to individuals conditioned to be held for public purposes enabled it to accomplish that object; and by the Sinking Fund Ordinance, which was a law of its own making, it acknowledged and protected the riparian interest, upon certain conditions which it reserved the power to impose, by authorizing all grants of land under water to be made at a fixed price and "to the parties legally entitled." It thus assumed, what was entirely true, "that in all cases" of its water grants there were riparian owners who had just claims to consideration, subject only to the paramount public right (*Chapman* v. *Kimball, supra*), and were equitably entitled to a preference of grant which would conserve those privileges, provided that they assented to the conditions imposed for the public use, and who, upon such assent, could be correctly described as "legally

entitled" to a deed. The ordinance says that in definite words " In *all* cases of grants of land under water * * * the comptroller shall issue a grant to the person legally entitled thereto."

It thus admits that in every such case, not merely grants of an extension, but in "all cases," including of course grants of the tideway, there is, or may be, a person who has an "equitable claim" to preference in the purchase. If grants of the tideway were not meant to be included why were they not excepted? Why the broad language applicable to all grants of land under water, if as to some there could be no person legally entitled to a deed? Precisely where we differ with the learned counsel for the plaintiff is in a single point. He maintains that the only persons who have equitable claims to priority of purchase are those to whom some statute has given an express pre-emption right, and those only were intended by the last clause of section 11. We believe that in that section the city conceded and assumed that in "all cases," even where no statute had settled it, there were persons having a just preference of purchase, and those were the adjacent owners. His theory would establish this : that, where in front of an upland owner there is no extension but only the tideway, and the city for commercial needs desires on such owner's front to have docks and wharves built for public use, and such owner is willing to accept a deed conditioned for the faithful execution of those purposes and to pay the city's price, and so at the same time secure the public use and his own water front, nevertheless such person has no equitable claim to the grant in preference to a mere stranger. Just that we dispute. The question is not as to the precise range and scope of that equity, nor even whether it could be by the courts enforced or protected, but simply whether, when his equity has been recognized, and the deed given to him, because in justice and fairness he should have it, the city can say he was not within the terms of section 11 of the ordinance because he had no equity, and could not have been "entitled to" his grant. That section was intended to dictate the mode of conveyance when-

ever consistently with the preservation of the public use and the valuation made by the city there was some one willing to buy, who, in justice, was entitled to a preference; and it assumed that there were such persons even as to the tideway; and as to that they could be none others than the riparian owners whose rights and equities, however imperfect in themselves, the State had always respected. If it had meant only statutory pre-emptors and sales to them it was easy to say so. In that event the very broad and general language found at both the beginning and the end of the section would hardly have been used. Instead of commencing " in all cases of grants of lands under water " it would have added " to parties having pre-emption rights," or " except between high and low water," or some equivalent expression. But if that had not been done and the clause had been left as it now stands the final sentence would not have read " to the parties legally entitled thereto," but a more definite and specific expression would have been used, as " to the parties having a right of pre-emption." Whenever, when about to make a sale to a person so situated as adjacent owner that equitably and justly in view of his riparian interest and the settled policy both of the State and city, the municipal authorities ought to recognize his claim to a preference, even though possibly he might be legally unable to enforce it, in every such case an auction sale would be improper and disregard the equity; and so in every such case the city is authorized to sell and the comptroller to issue the grant as provided by section 11 of the Sinking Fund Ordinance. It follows that the deed of the tideway, and as a consequence of the extension, were good under that section, although the deed of the latter might further be sustained under the act of 1852.

If it be said that by this ruling we have practically given to the upland owner a pre-emptive right in the tideway, and so qualified the city's fee, and usurped the office of a statute, we answer that we have done neither. The riparian rights, however imperfect or subordinate, existed long before this court came into being; they were subject only to the paramount

needs of a public use; when that did not require their total destruction, and was consistent with their preservation it was the city's duty to respect them, and the city did so by providing for a sale not at auction. It meant and intended to keep all such cases within the range of its own power to do justice and recognize equities, however imperfect, and though not bound to regard them. We but follow and enforce the municipal ordinance and construe its terms so as to secure the result which it intended. If thus some little shred or faint shadow of riparian right on navigable waters is preserved in this State, through the sense of justice of the State and its municipal grantee, while on the longer coasts of other States the right is firmly pushed to low-water mark, and shielded by the law, we do not think the little thus gained is unwise, or inequitable, or an occasion of regret.

The judgment should be affirmed, with costs.

All concur, except RUGER, Ch. J., and EARL, J., dissenting, MILLER, J., not voting.

Judgment affirmed.