BARDES et al. v. HERMAN.

(Supreme Court, Appellate Division, Second Department. May 26, 1911.)

1. VENDOR AND PURCHASER (§ 141*)—RESCISSION BY PURCHASER—DEFECT IN TITLE IN GENERAL.

To justify his refusal to consummate an agreement to purchase land because of a defect in the title, the vendee must point out the defect and show that it renders the title unmarketable.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 265; Dec. Dig. § 141.*]

2. SPECIFIC PERFORMANCE (§ 95*)—GROUNDS—DISCRETION OF COURT.

In its sound discretion the court may compel specific performance of a contract for the purchase of land, though the title be not perfect, if the defect be based on a mere contingency, which according to ordinary experience cannot arise.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 257–277; Dec. Dig. § 95.*]

3. NAVIGABLE WATERS (§ 37*)—GRANTS OF LAND UNDER WATER—STATUTES —CONSTRUCTION.

Rev. Laws 1813, c. 74, § 4, gave the commissioners of the land office power to grant "to the proprietors of adjacent lands" so much of the waters of navigable rivers or lakes as they should deem necessary to promote the commerce of the state. Laws 1815, c. 199, § 1, extended this power of the commissioners to lands under water adjacent to and surrounding Staten Island, provided that no grant should extend more than 500 feet into the water from the low-water mark. Held, that this latter restriction merely fixed a limit to the extent of the grant of lands under water, and did not define the beginning of the grant.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*]

4. NAVIGABLE WATERS (§ 37*)—LANDS UNDER WATER—GRANTS—CONSTRUCTION—"ADJOINING"—"OPPOSITE TO."

Laws 1815, c. 199, § 1, supplementing Rev. Laws 1813, c. 74, § 4, allowed the commissioners of the land office to grant to "adjacent" owners land under the water surrounding Staten Island, which grant was not to extend more than 500 feet from low-water mark. A riparian landowner applied for a grant of land opposite to and "adjoining" his, and extend-

------

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing to a point 500 feet from low-water mark, and an affidavit appended to his application described his land as being bound by the low-water mark. The Attorney General recommended that applicant be granted the land "opposite to" that now held by him, and the commissioners passed a resolution that letters patent be issued to him for the land under water applied for. A patent was issued, describing the land granted as beginning at low-water mark and extending to a point 500 feet out. *Held*, that the words "adjoining" and "opposite to" must be understood to be equivalent to "adjacent" as used in the statute, and the application must be taken to apply to land immediately contiguous to that of the applicant, and as declaring that he owned the land to low-water mark, and hence was broad enough to include any land lying between his actual boundary and low-water mark, so that the patent must be construed as granting to applicant all the land lying between his land and a line 500 feet out from low-water mark, as any other construction would not be in accord with the commissioners' resolution, and would render the patent void under the statute.

[Ed. Note.—For other cases, see Navigable Waters, Dec. Dig. § 37.*

For other definitions, see Words and Phrases, vol. 1, pp. 187–190.]

5. **STATUTES (§ 238*)—CONSTRUCTION OF LEGISLATIVE GRANTS.**

Public grants are not to be so strictly construed as to defeat the intent of the Legislature, or to withhold what is given expressly or by fair implication.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 319; Dec. Dig. § 238.*]

6. **VENDOR AND PURCHASER (§ 129*)—SUFFICIENCY OF VENDOR'S TITLE.**

In a suit for specific performance of a contract for the sale of land, evidence *held* to show that it was impossible to determine whether the land was located on a strip of land formerly under water, title to which it was claimed was in the state; and hence the contract would be enforced against the purchaser, there being no probability that the state's title could be sustained.

[Ed. Note.—For other cases, see Vendor and Purchaser, Dec. Dig. § 129.*]

Appeal from Special Term, Richmond County.

Action by John Bardes and another against Martin Herman. From a judgment for plaintiffs (62 Misc. Rep. 428, 114 N. Y. Supp. 1098), defendant appeals. Affirmed.

Argued before JENKS, P. J., and HIRSCHBERG, BURR, WOODWARD, and RICH, JJ.

Seldon Bacon (Saul S. Myers, on the brief), for appellant.

William A. Shortt, for respondents.

BURR, J. On January 17, 1907, plaintiffs entered into a contract with the defendant to sell a plot of ground situated on the southeasterly corner of Wave and Bay streets, in the borough of Richmond and city of New York; the plot being 75 feet wide in front on Bay street and in the rear, and 116 feet on Wave street and on the side of the plot parallel thereto. On the date specified in the contract, plaintiffs tendered a deed purporting to convey the said premises and demanded payment of the purchase price. Defendant refusing to perform, and asserting a defective title, this action was brought to compel a specific performance of the contract.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

[1] A vendee, who refuses to take title upon the ground of a defect therein, must point out the objection and give proof tending to establish it, or to create such a doubt in respect thereto as to make the title unmarketable. Greenblatt v. Hermann, 144 N. Y. 13, 38 N. E. 966; Rosenblum v. Eisenberg, 123 App. Div. 896, 108 N. Y. Supp. 350. It will not do for the defendant to say he is not satisfied with the title, without showing some lawful incumbrance or claim existing against it. Folliard v. Wallace, 2 Johns. 395.

[2] If the existence of the alleged fact which is claimed or supposed to constitute a defect in or cloud upon the title is a mere possibility, or the alleged outstanding right is but a very improbable or remote contingency, which according to ordinary experience has no probable basis, the court may, in the exercise of a sound discretion, compel the purchaser to complete his purchase. Cambrelleng v. Purton, 125 N. Y. 610, 26 N. E. 907; Ferry v. Sampson, 112 N. Y. 415, 20 N. E. 387.

Plaintiffs' title to the premises in question is derived through various colonial grants and letters patent from the people of the state of New York, and defendant's only objection to the validity of such title is based upon the contention, first, that the grants to Norwood, hereinafter referred to, were bounded on the east by the high-water mark as it existed at that time, and that the patent to Vanderbilt, also hereinafter referred to, was bounded on the west by the low-water mark as it existed at that time, and that consequently the foreshore between high and low water mark has never been granted by the people of the state of New York to any person; and, second, that all, or some portion, of the premises in question constitutes a part of such foreshore, and lies between the high-water line as it existed when the Norwood grants were made and the low-water line as it existed when the Vanderbilt patent was granted. Unless each of these propositions are sustained, the judgment in this action should be affirmed.

On September 29, 1676, Edmund Andros, Governor of the province of New York, granted to one Andrew Norwood a piece of land on Staten Island, lying upon the easterly side thereof. This land was described as bounded to the northward by the land of Col. Francis Lovelace, to the east by the waterside, and to the south and west by the commons. On September 29, 1677, a further grant was made by the Governor of the province to the said Norwood of a piece of land lying to the northward of the said Norwood's plantation on Staten Island, "which hath, by said Governor's order, been laid out for Andrew Norwood aforesaid," being in length by the waterside 114 rods, and ranging west-southwest up to the hills thereby 5 rods, being bounded to the northward to the land formerly belonging to Col. Francis Lovelace, and to the west by the hills, quota, in all, 25 acres.

The learned court at Special Term found as a fact that the premises in question are within the bounds of the tract thus granted to Andrew Norwood. The defendant contends that there is no evidence to sustain this finding, because the description contained in these grants defines the boundary on the east as "by the waterside," and therefore

the land conveyed thereby extended to high and not to low water mark.

Reserving for future consideration the question whether the premises in question are within the foreshore, we do not deem it necessary for us to determine in this case what line was intended by the words "to the east by the waterside" in the grants in question. We think that the people of the state of New York, who alone could raise any question as to the validity of this title, are not in a position to make any claim to the land between high and low water mark under the circumstances here disclosed.

[3] By various devises and mesne conveyances the property described in the grants to Norwood became vested in the year 1803 in one Cornelius Vanderbilt. By an act of the Legislature (1 Revised Laws 1813, c. 74, § 4) the commissioners of the land office were given power to grant so much of the waters of navigable rivers or lakes as they should deem necessary to promote the commerce of the state. There was a restriction upon their powers to the effect that no such grant should be made to any person other than the proprietor of the adjacent lands. The powers of the said commissioners were subsequently extended to the lands under water adjacent to and surrounding Staten Island, but a further restriction was imposed upon them that no grant should be so made as to interfere with any rights of the corporation of the city of New York, or to extend more than 500 feet into the water from low-water mark. Laws of 1815, c. 199, § 1.

The restriction in the latter statute that such grant of lands adjacent to and surrounding Staten Island should not "extend more than five hundred feet into the water from low-water mark" was not intended to define the westerly boundary line thereof as the low-water mark, but rather to fix a limit measured from that point beyond which no grant could be made. This must be so, unless we are to assume, either that no grant could be made to any one who did not own the foreshore, since in that case he would not be the proprietor of adjacent lands, or that the people were to grant to the owner of the upland above high-water mark land under water between low-water mark and a point 500 feet therefrom, reserving to itself the foreshore, which would be of little or no avail to the people, and would seriously interfere with the availability for purposes of commerce of the land granted to the grantee named therein.

[4] In 1817, the said Cornelius Vanderbilt made application to the commissioners of the land office—

"for a grant of land lying under water extending 500 feet from low-water mark, opposite to and *adjoining the front* of the lot of land occupied by him, fronting on the bay of New York and lying between the land of the heirs of Abraham Van Duzer, deceased, on the north and of John Gore on the south in the town of Southfield, for the purpose of wharfing or otherwise improving the same."

It will be observed that the statute limited the power of the commissioners to make a grant to the proprietor of the "adjacent" lands, and that Vanderbilt, in his application, described himself as the owner of the lands "adjoining" those applied for. We think that the

word "adjacent," as used in the statute, and "adjoining," as used in his application, must each be construed as referring to lands in actual contact with each other, and excludes the idea of any intervening space. In re Ward, 52 N. Y. 395; Yard v. Ocean Beach Ass'n, 49 N. J. Eq. 306, 24 Atl. 729; People v. Schermerhorn, 19 Barb. 540; Holmes v. Carley, 31 N. Y. 289; Houghtaling v. Groesbeck, 51 N. Y. 673; Bent v. Glaenzer, 17 Misc. Rep. 569, 40 N. Y. Supp. 657; Lewis v. Johnson (C. C.) 90 Fed. 673; State v. Downs, 59 N. H. 320; Akers v. United N. J. R. & Canal Co., 43 N. J. Law, 110; Mayor v. Hart, 95 N. Y. 443.

We think it is clear that Vanderbilt intended to apply for a grant of land immediately contiguous to that which he already owned. It is inconceivable that he intended, while making an application for a grant for the purpose of promoting commerce, to leave to the people of the state a strip between high and low water mark intervening the land which he already owned and that which he sought then to acquire.

Attached to his application was an affidavit by a surveyor stating that the land shown on the annexed survey was a correct survey of the land under water fronting and *adjoining* the land of Cornelius Vanderbilt in the town of Southfield. In the said affidavit the land was specifically described as:

"Beginning at the outlet of a run of water on the line of land of Abraham Vanduzer, late deceased, and running from thence *along low-water mark* due south."

It was further described as bounded on the north by the course of a patent granted Elizabeth Van Duzer and others, on the east by the bay, on the south by a line with the land of John De Forest, and *on the west by land of the said Cornelius Vanderbilt.*

The application was equivalent at least to a declaration upon Vanderbilt's part that he claimed under the Norwood patent that his easterly boundary line was the low-water mark, and that title to the foreshore was already vested in him, and the action of the people, by its representatives, indicated its acquiescence therein. But, if he erred in this conclusion, his application was sufficiently broad to include such foreshore, for the reason that it asked for land *adjoining* his.

The Attorney General, to whom this application was referred, reported:

"That from the evidence exhibited to him he is satisfied that the applicant has a valid title to the lands lying in the town of Southfield, in the county of Richmond, fronting the bay of New York, and opposite to those for which a grant is now prayed, and that the same are now in his actual possession."

The Attorney General further states that he is of opinion that the said Cornelius Vanderbilt is *entitled* to a grant of the said lands under water, if the commissioners of the land office deem the same conducive to the promotion of the commerce of the state.

It is true that the Attorney General, in his report, used the words "opposite to," instead of the words "opposite to and adjoining," which were employed by Vanderbilt in his application. But it is impossible to believe that it was thereby intended to convey a different meaning. The statute forbade a grant to any other than the owner of "ad-

jacent" lands, and it is equally as impossible to believe that the people of the state intended to reserve a strip of land between these two parcels, bounded on the one side by high and the other by low water mark, as that Vanderbilt could have asked for a grant permitting such reservation, or that the Attorney General would have recommended a grant which was void, because not to an adjacent owner.

On April 16, 1818, the commissioners of the land office adopted a resolution, reciting the report of the Attorney General, and declaring:

"That the board do (sic) concur in opinion with the Attorney General and that letters patent issue to the said Cornelius Vanderbilt *for the land under water applied for by him* agreeable to such return of survey thereof as shall be made by the surveyor general."

As we have seen, Vanderbilt made application for all of the land under water lying between the then existing easterly boundary line of his land and a line distant 500 feet easterly from the low-water mark, and the land commissioners resolved to issue to him letters patent for the land *which he had applied for*. On the last-mentioned date letters patent were issued. These specifically described the property as beginning at the southernmost bounds of land of Van Duzer at low-water mark on the shore of the bay, and running thence along the low-water mark, and then by various courses and distances back to the place of beginning. If Vanderbilt's title to the adjacent land did not then extend to the low-water mark on the shore of the bay, the letters patent as issued were not in strict accordance with the terms of the resolution authorizing the same. The intent of the commissioners, as to the extent of the grant, as determined by the resolution which they adopted, was, as we think, to grant to Vanderbilt all of the land owned by the people, from his easterly boundary line, wherever it might be, to a point 500 feet east of the then existing low-water line.

The consequences of concluding otherwise are so serious that, unless compelled so to do, we should refrain therefrom. As the statute forbids the granting of lands under water to any but the owners of adjacent lands, if the grant to Vanderbilt was not intended to extend on the west so as to touch upon and adjoin his easterly boundary line, wherever it actually was, then the commissioners may have been guilty of doing a void thing, known to them to be contrary to the provisions of law, and, if the whole Vanderbilt patent was void, all structures of every kind since that time placed thereon are in the nature of "purprestures." If the letters patent actually issued did not conform to the terms of the resolution as adopted, it may be that they are subject to correction in this regard, or at least to construction.

[5] Public grants are not to be so strictly construed as to defeat the intent of the Legislature, or to withhold what is given, either expressly or by necessary or fair implication. United States v. Denver & R. G. R. Co., 150 U. S. 1–14, 14 Sup. Ct. 11, 37 L. Ed. 975; Winona & St. Peter R. R. Co. v. Barney, 113 U. S. 618, 5 Sup. Ct. 606, 28 L. Ed. 1109. If the purpose of the commissioners of the land office, who were appointed by the Legislature to represent the people of the state, was to grant the entire land between Vanderbilt's previous-

ly existing easterly line and the easterly line as described in the letters patent, no claim could now be justly or validly made by the people of the state with respect to any portion of the land covered by the terms of the resolution.

[6] But, if we are wrong in our construction of the intent and meaning of the acts of the commissioners in connection with the granting of this patent, the evidence fails to establish the second fact essential to defendant's success. It does not appear that any portion of the premises in question lies between high and low water mark and within the lines of the foreshore. On the contrary, the evidence adduced on the part of the defendant is to the effect that it is impossible to determine where the lines of high and low water mark were, either in 1676 and 1677, when the Norwood grants were made, or in 1818, when the Vanderbilt patent was issued. It also appears affirmatively that, as early as 1852, the high-water line of the waters of New York Bay, as it then existed, was some distance to the east of the premises in question; that at that time the premises in question were solid land, and shown on a map filed in the county clerk's office by the persons who had acquired the Vanderbilt title, and that both Wave and Bay streets were laid down on said map. As early as 1853 Wave street was physically marked out, since 1853 has been open and traveled by the public, since 1874 has been worked and kept in repair by the village of Edgewater and the city of New York, and since 1880 has been paved with macadam and had sidewalks on either side thereof. Since 1860 the premises described in the complaint have been assessed for taxes, and the taxes thereon have been paid, and in 1885 the Comptroller of the State of New York sold the premises in question for unpaid taxes, and in 1889 conveyed the same, in the name of the people, to one John Mutschler, whose title, whatever it may have been worth, was subsequently acquired by the plaintiffs in this action.

Under such circumstances, we conclude that, in the language of the Cambrelleng Case, supra, it is "a very improbable or remote contingency, which, according to ordinary experience, has no probable basis," that the people of the state will ever assert any claim to any part of these premises upon the ground that they were included within the limits of the foreshore, and were never granted to any of the persons claiming to be the owners thereof or their predecessors in title, and, if such claim were made, we fail to see how, by any possibility, it could be sustained.

We think, therefore, that the judgment appealed from should be affirmed, with costs.

JENKS, P. J., and HIRSCHBERG and WOODWARD, JJ., concur. RICH, J., not voting.