## SUPREME COURT.

### WILLIAM H. WEBB *et al.* agt. THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK *et al.*

*Constitutional law — So much of chapter 456, Laws of 1881, for the removal of the Forty-second street reservoir as provides for the conversion of the land into a public park, is unconstitutional — That part relating only to the removal, cannot be saved because standing alone. New York, city of — State no power to take away the city's vested rights of property.*

So much of chapter 456 of the Laws of 1881, for the removal of the Forty-second street reservoir, in the city of New York, as provides for the conversion of land into a public park, is unconstitutional, because it is in violation of the third article of the state constitution, which declares "that no private or local bill which shall be passed shall embrace more than one subject and that shall be expressed in the title." So much of the act as relates only to the removal of the reservoir cannot be saved, because, standing alone, it merely orders, without cause, the destruction of valuable property, and hence is not in the line of legitimate and intelligent legislation.

The corporation of New York, by virtue of its ancient charters, confirmed by the constitution, is the owner in fee simple of the lands in question, and the legislature has no power to order the demolition of the structure thereon, except for public purposes and upon making just compensation. Though doubtless competent, when the British rule ceased, for the state to take away from the city of New York its property rights and privileges, yet not having done so, and having recognized such rights by the Constitution of 1777, and having become amenable to the provisions of the Constitution of the United States of 1787, by which it was prohibited to pass any law impairing the obligations of contracts, it is not competent for the state, under cover of exercising political powers, to take away the city's vested rights of property. Such rights are as indestructible by legislative act as are the property rights of citizens.

*Special Term, September,* 1882.

*Coe & Potter,* attorneys.

*John F. Dillon, Edward Fitch* and *Elliot Sanford,* of counsel for plaintiffs.

*William C. Whitney,* counsel to the corporation.

*David J. Dean, Joshua M. Van Cott, W. Hartwell* and *Chas. B. Hart,* for defendants.

MACOMBER, *J.* — The plaintiffs bring themselves within the provisions of chapter 531 of the Laws of 1881, entitled "An act for the protection of taxpayers," by which persons who are taxpayers in municipal corporations may bring and main- tain actions to prevent the officers of such corporations from executing or performing illegal acts.

The object of this action is to restrain the defendants from carrying into effect the provisions of chapter 456 of the Laws of 1881, on the ground that such act is unconstitutional. That law is entitled "An act for the removal of the reservoir situate in the city of New York, between Fortieth and Forty-second streets." By the first section thereof the reservoir is declared to be abandoned, and the commissioner of public works of the city is directed, within six months from the passage of the act, to remove the pipes which connect with the reservoir and to lay a main in Fifth avenue, between Fortieth and Forty-second streets, so as to connect the mains now leading in and out of the reservoir. By the same section the commissioner is directed to remove the structure and grade the ground now occupied by the reservoir to the level of the adjacent streets in a suitable manner for the purpose of a park, all of which is to be accomplished within a year from the passage of the act.

By the second section the cost and expenses of the removal of the pipes and the laying of the new main are directed to be raised by tax upon the real and personal property of the city which may be included in the tax levy of the years 1881 and 1882. The cost of removal of the structure and of grading the ground occupied by it is directed to be paid by the owners of property bounded by the westerly side of Sixth avenue and southerly side of Thirty-seventh street, and easterly side of Madison avenue and the northerly side of Forty-fifth street.

By the third section the comptroller of the city was authorized to pay the cost and expenses of the improvement, and in order to make the same he was authorized and empowered and directed to issue revenue bonds of the city, which should bear such a rate of interest as the comptroller should deem proper, not exceeding, however, six per cent per annum, which should be sold at not less than par.

By the fourth section the land occupied by the reservoir, together with the adjacent land lying west thereof known as Reservoir square, was directed to be converted into a public park to be laid out by and under the control and management of the park commissioners, and kept and maintained by them as one of the public parks of the city of New York.

The fifth section prohibited the use of such park for military parades, drills, inspections or reviews of any kind.

It is claimed, and I think justly, that the act in question is unconstitutional because it was passed in violation of the sixteenth section of the third article of the constitution of the state, which declares "that no private or local bill which shall be passed shall embrace more than one subject, and that shall be expressed in the title." By the title of the act the only subject mentioned is the removal of the reservoir, while the body of the act itself, though providing for such removal, is directed mainly to the establishment of a public park in the city of New York. Undoubtedly if the act had been entitled "An act for converting the reservoir into a public park," the demolition of the structure itself might have been necessarily implied by the very terms of the act. But the converse of this is by no means true. So far as the title of the act informs us the ultimate purpose for which the structure should be removed might be the erection of a government building or the parceling out of the land among the adjacent owners.

But it is contended, on the part of the defendants, that though the act may be unconstitutional and void in so far as it attempts to establish a public park, yet it may be saved for the purposes for which it is properly entitled. It is true that

a portion of the act follows legitimately its title, and hence if the mere destruction of the masonry composing the reservoir was in the line of legitimate legislation, the act would not be open to this objection. The general rule that that portion of a statute which is constitutional shall be saved though a part of it is unconstitutional admits of this qualification, namely, that the legislation shall seem, upon its face at least, to be proper and intelligent. This is so stated by judge COOLEY in his work on Constitutional Limitations, in language, adopted in the court of appeals in the case of *The People* agt. *Briggs* (50 *N. Y.*, 566), as follows: "But if the act is broader than the title, it may happen that one part of the act stand because indicated by the title, while as to the object not indicated by the title it must fall. Some of the state constitutions, it will be observed, have declared that this shall be the rule; but the declaration was unnecessary, as the general rule that so much of the act as is not in conflict with the constitution must be sustained would have required the same declaration by the courts. If by striking from the act all that relates to the object not indicated by the title, that which is left is complete in itself, sensible, capable of being executed, and wholly independent of that which is rejected, it must be sustained as constitutional. The principal questions in each case will therefore be whether the act is, in truth, broader than the title; and if so, then whether the other objects in the act are so intimately connected with the one indicated by the title that the portion of the act relating to them cannot be rejected and leave a complete and sensible enactment which shall be capable of being executed."

The passage quoted has special application to this case. Without the provisions relating to a public park, and the means of paying the expenses of making the same, no intimation of which is made in the title of the act, there remains only the statute enacted for the purpose of the destruction of valuable property. No claim is made that the reservoir is a nuisance, in that its maintenance may endanger life, limb

or health. It does not, therefore, come within the rule above stated, that the part of the act which may be saved from this constitutional objection shall be intelligent, or, as judge COOLEY puts it, " sensible." Suppose, for instance, that the act had required the commissioner of public works of the city of New York to demolish the statuary in Union square, could it be claimed that the act was in the line of legitimate legislation and intelligent? Clearly it could not. This is by no means a technical objection. A constitutional objection cannot be technical. In civil cases there are no degrees in offenses against the organic law.

I am, therefore, of the opinion that the act in question is open to the objection that it is contrary to the constitutional provision above referred to, and that for this reason the defendants should be restrained from carrying its provisions into effect.

But a more interesting question is presented by the claim made in behalf of the plaintiffs, that the act is unconstitutional because it violates the rights of property of the city of New York. The land which is covered by the reservoir, together with the land west of it known as Reservoir square, was granted in fee simple to the city by what is known as the "Dongan charter," in 1686. That charter is substantially embraced in the Montgomerie charter, so called, of 1730. The third section of the Dongan charter is as follows : "And I do by these presents give and grant to the said mayor, aldermen and commonalty of the said city of New York, all the waste, vacant, unpatented and unappropriated lands, lying and being within the said city of New York, and on Manhattan island aforesaid, extending and reaching to low-water mark, in and by and through all parts of the said city of New York and Manhattan island aforesaid, together with all rivers, rivulets, coves, creeks, ponds, waters and water courses in the said city and island, or either of them, not heretofore given or granted by any of the former governors, lieutenants or commanders-in-chief, under their or some of their hands and seals, or

seal of the province, or by any of the former mayors or deputy mayors and aldermen of the said city of New York." By the sixth section it is provided that "the mayor, aldermen and commonalty of New York be and shall be forever hereafter, persons able and in law capable to have, get, receive and possess lands, tenements, rents, liberties, jurisdictions, franchises and hereditaments to them and their successors in fee simple or for a term of life, lives or years, or otherwise. * * * And also to give, grant, let, set and assign the same lands, tenements, hereditaments, goods and chattels; and to do and execute all other things about the same, by the name aforesaid."

The same power is reiterated and restated in the twelfth section and in the fourteenth section. The same rights were restated in the thirty-sixth and thirty-seventh sections of the Montgomerie charter. The last charter was confirmed by the colonial legislature in 1732, and again by the constitutions of 1777, of 1821, and of 1846.

The lands in question, therefore, are owned by the city in fee simple absolute. This was so held in the case of *Furman* agt. *New York* (5 *Sandf.* [*S. C.*], 16), and in the same case (10 *N. Y.*, 567). If, therefore, the legislature has undertaken by its acts to destroy the property of this corporation, or to deprive the city of its use, without just compensation, it has violated a fundamental law of the state. Chancellor KENT (*City Charter in Kent's Notes*), in commenting upon the provisions of the ancient charters of the city, says: "It may not be amiss to state here, once for all, that it is an acknowledged and settled principle that no vested right of property, whether it belongs to private individuals or be in the shape of a corporate franchise, can ever be lawfully taken away without some default or forfeiture to be ascertained by a fair trial and pronounced by judicial decree. The English statute of *Magna Charta* establishes as a great principle the sanctity of rights and privileges then existing or thereafter to be lawfully procured; and that principle was intended to be of general and

perpetual application. It provided that the city of London, and all other cities, should have all their liberties and free customs; and that no freeman should be disseized of his freehold or liberties, or free customs but by lawful judgment of his peers or by the law of the land. Corporate franchises in this country rest on a basis which ought to be at least as solid as *Magna Charta*, for they are founded on grants which are contracts, and 'no state,' says the Constitution of the United States, 'can pass any law impairing the obligation of contracts.' "

I perceive no difference between the tenure of property thus held by the city and the proprietary rights of natural persons or private corporations. This privilege, however, is peculiar in this state to the city of New York. Its corporate name is the same that it has had for upwards of two hundred years, long antedating the organization of the state as an independent political entity. And while it was doubtless competent, when the British rule ceased, for the state to take from the city of New York its property rights and privileges, as an episode of the revolution, it is sufficient to say that it did not see fit to do so. Having once recognized such rights by the organic law of 1777, and having become, ten years afterwards, amenable to the provisions of the Constitution of the United States, by which it was prohibited to pass any law impairing the obligations of contracts, it is not, in my judgment, competent for the state; under cover of exercising political powers, to take away from the city any vested rights of property. It seems to me that such rights are as indestructible by legislative act as are the property rights of citizens.

Nor is this property, with other real estate owned by the city, held in trust for any person, nor is it stamped with any mere political trust of which the city may be deprived and thus its claim to the right to the possession of the property destroyed. The title to the land rests somewhere, and, as has been shown above, so far as the records extend, no one claims it except the city itself. No one has been in possession of it except the city. So that no necessary rights have been

acquired by any person adverse to the city. Hence I say that the complete title of the city to the lands in question is not merely inferentially saved, but is expressly saved to the city by the thirteenth section of article first of the state constitution, which says that "the entire and absolute property is vested in the owners according to the nature of their respective estates." The idea of a trust under such circumstances, it seems to me, involves a contradiction in terms. How can a trust be attached to a title in fee simple of land? In trust for whom? If for anybody other than municipal corporation, it would be the inhabitants of Manhattan island. But the mayor, aldermen and commonalty, the entity which owns the title of the real estate, are the people of Manhattan island. The owner, then, and *cestui que trust* are the same, and that a person should hold anything in trust for himself is a legal solecism.

It seems to me that the weight of authority is to the effect that the property which New York holds in its proprietary or private character, though originally derived from the power claiming the ultimate title, and which concerns the private advantage of the corporation, as a distinct legal personality, is stamped with so many of the rights and powers of natural persons or private corporations as that the city cannot be deprived of this reservoir without due process of law and without just compensation. It admits of no doubt that the legislature may change, modify, enlarge or restrain the powers of a corporation which it has created. But whenever this is done, and a municipal corporation is relieved of the privilege and duty of maintaining a jurisdiction over the property and property rights, care has invariably been taken to restore to the original owner or proprietor the rights which the municipal corporation were for a time permitted to exercise (*Ferret* agt. *Taylor*, 9 *Cranch*, 52; 2 *Kent's Commentaries*, 257; *Dartmouth College case*, 4 *Wheat.*, 694; *People* agt. *Detroit*, 28 *Mich.*, 228; *Bailey* agt. *Mayor*, &c., of *New York*, 3 *Hill*, 531; *People* agt. *Fields*, 58 *N. Y.*, 591; *People* agt. *Ingersoll*, *Id.*, 1; *Maxmillian* agt. *New York*, 62 *N. Y.*, 160).

Mr. justice Cooley's language in the *Detroit Park case* is: "The constitutional principle that no person shall be deprived of property without due process of law applies to artificial persons as well as natural, and to municipal corporations in their private capacity as well as to corporations for manufacturing and commercial purposes; and when a local convenience or need is to be supplied, in which the people of the state at large, or any portion thereof outside of the city limits, are not concerned, the state can no more, by process of taxation, take from the individual citizens the money to purchase it than they could, if it had been procured, appropriate it to the state use. To this extent the corporate rights appear to us to be a clear and undoubted exception to the general power of control which is vested in a state." The court there held that the city of Detroit had a right to decide for itself whether or not it would purchase a public park, and that an act to compel the city to purchase it against its will was held to be unconstitutional. See, also, *Montpelier* agt. *East Montpelier* (29 *Vt.*), where Isham, J., says: "It has uniformly been held that towns and other public corporations may have private rights and interests vested in them under their charter, and as to those rights they are to be regarded and protected the same as if they were the rights and interests of individuals or private corporations; and grants of property in trust for other than corporate and municipal use (that is, as we understand for private as distinguished from public purposes) are no more the subject of legislative control than are the private and vested rights of individuals (*See, also, Savings Society* agt. *Philadelphia,* 31 *Penn. St.,* 183; *People* agt. *Bachellor,* 53 *N. Y.,* 128, 141; *Bailey* agt. *Mayor and Aldrich* agt. *Tritt,* 11 *R. I.,* 141; *Weismer* agt. *Village of Douglass,* 64 *N. Y.,* 91).

The learned counsel for the defendants do not claim that the legislature may deprive the city of property which it owns in fee, but they argue that the legislature may direct what use such property shall be put to by the city, and may prescribe

what department of the corporation shall manage it. Within certain limits this contention may be conceded to be correct. Indeed, in the exercise of its superintending and governmental powers, as *parens patriœ*, the legislature doubtless may designate the particular instrument in the varied and somewhat complex machinery of this vast municipality, for discharging its duties and for the protection of its rights. But I cannot assent to the proposition that the state may, absolutely and unqualifiedly, direct the use which shall be made by the city of its property held in fee when the use named, by necessary intendment, and the mode adopted of changing an old public use to another, involves a denial of all the essentials entering into proprietorship.

The case of *Darlington* agt. *The Mayor, etc.* (31 *N. Y.*, 164), decided only the question which was before the court, namely, that the act of 1855, for compensating parties whose property may be destroyed in consequence of mobs or riots, was constitutional, and that judgments rendered against the city of New York for such cause have the same force against the property of the city as judgments rendered for any other cause of action. It seems to me, regarding only the thing there actually adjudged, instead of this being an authority against the relief sought by the plaintiffs, that it is directly in the line of the views hereinbefore expressed, because it decides that the property which the city holds as proprietor, or absolute owner, is liable to satisfy judgments against the city, while the property held for strictly public uses is not. It is frequently said that the power to alienate property is a test of ownership; but it is hardly as certain a test as the liability of that property to be taken away, in *invitum*, by execution.

The other cases cited by the defendant's counsel, though involved in one way or another in the question so elaborately argued, do not, in view of the grounds selected for my decision, require special comment.

Judgment must be ordered for the plaintiffs.