### SAGE v. MAYOR, ETC., OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. November 20, 1896.)

1. WATERS—ACCRETIONS—TIDEWAYS.

    A grant to freeholders by the governor of the colony of New York of land bounded on one side by a river did not carry accretions to the land, where the tideway of the river was granted by royal charter to the city of New York.

2. SAME—RIPARIAN RIGHTS—COMPENSATION FOR DESTROYING.

    Where the tideway of a river was granted to New York City by royal charter, and the state afterwards increased the grant to an exterior street, under water, to be laid out by the city, an owner of upland property bounded by the river has no riparian rights for which compensation must be made when the city fills in the tideway in front of the property for the purpose of creating the street. Ingraham, J., dissenting.

Appeal from special term, New York county.

Action by Henry W. Sage against the mayor, aldermen, and commonalty of the city of New York, to enjoin defendant from entering on certain premises described in the complaint, or from interfering in any way with the same, to compel defendant to account, and to quiet plaintiff's title to said premises, and for other relief. The complaint was dismissed, and plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

William C. De Witt, for appellant.

T. Connoly, for respondent.

PATTERSON, J. The claim of the plaintiff is presented in two aspects: First. He asserts ownership of the land reclaimed from the water, and contiguous to his upland; an alleged ownership arising from ancient grants, or, failing that, growing out of the principles and rules of law relating to accretions of land from alluvion or reliction. Second. If it is held that the claim of ownership of the made or reclaimed lands is not established, the plaintiff insists that he is entitled to compensation for the destruction of his riparian

rights caused by the acts of the officers of the city of New York in carrying out the improvement of the water front opposite his premises, which acts are set forth in the pleadings or admitted in the stipulation containing the proofs in this action. We understand that the defendant does not urge any objection to the form of the action, and therefore we have not taken that subject into consideration.

It was held in the court below that the plaintiff's ownership was of the upland to high-water mark only. There is nothing in the agreed statement of facts to justify a different finding. The plaintiff's title to the upland is derived from or through the grant of Gov. Nicolls, made in 1666, to the freeholders and inhabitants of Harlem. That grant stopped at high-water mark. Mayor, etc., of New York v. Hart, 95 N. Y. 443. The land under water between high and low water mark, or, as it is called, the "tideway," has belonged to the city of New York since 1686. That necessarily disposes of the plaintiff's claim to a title by deed or grant. The same result follows with respect to his claim to the made land as an accretion. By the Dongan and Montgomery charters, the city of New York acquired title to all the land between high and low water mark. Towle v. Remsen, 70 N. Y. 303. The title thus acquired has been virtually confirmed by every constitution of the state of New York from that of 1777 to that of 1894, and is the foundation of the right of the city and its grantees to the whole water front of Manhattan Island. The improvement made in front of the plaintiff's premises, either by filling in or by the construction of the exterior street and bulkhead, and the consequent exclusion of the water from the former tideway, has merely converted the city's land under water into terra firma. The city has lost no right, nor has the plaintiff acquired any, simply because of the reclamation of the land, for that land was indisputably the property of the city in its original state, and has not ceased to be so because its surface has been made permanently dry land. The plaintiff, therefore, has no claim to ownership of any of the land between original high and low water mark, and he can claim nothing beyond low-water mark, for the interposed land of the city lies between his property and that reclaimed between low-water mark and the exterior street.

That leaves for determination the question of the right of the plaintiff to compensation for the destruction of riparian rights or easements. It is unnecessary in this particular case to consider the general subject of the right an upland owner has in, to, or upon the waters immediately adjacent to his property. The contest between the parties to this action must be disposed of upon the particular facts relating to the property rights of the city of New York in the land under water immediately surrounding Manhattan Island. By the Dongan charter, of April 27, 1686, all the land under water, between high and low water mark, around that island, was granted to the city of New York. The Montgomery charter of January 15, 1730, confirmed the Dongan grant, and ceded an additional 400 feet beyond low-water mark, from the Battery to what is now known as King or Charlton streets, on the North river, and to Corlears Hook

(about Houston street), on the East river.    By an act of the legislature of the state of New York, passed April 3, 1807, the grant of the additional 400 feet was extended on the North river to about Seventy-Fifth street, and on the East river to about Fortieth street.    By an act of the legislature passed February 25, 1826, the grant of the 400 feet line of 1807 was extended on the North river to Spuyten Duyvil creek, and on the East river to the Harlem river.    On the 14th of April, 1852, land under water on the Harlem river, from the East river to the North river, and beyond low-water mark, and to an exterior street to be laid out by the city, was granted.    The premises in question had a frontage on the Harlem river, and, as has been seen, the land under water between high and low water mark in front of such premises was granted to the city by the Dongan charter, in 1686, and the additional grant of land under water to the exterior street was granted by the act of April 14, 1852.    The improvement constructed by the city of New York has redeemed, from the water, land ceded in part by the original charters and in part by the act of 1852.    It is an improvement for the benefit of the public.    If the grant to the city of New York contained in the Dongan charter authorizes it to destroy or impair the plaintiff's alleged riparian rights without compensation, it becomes altogether immaterial to consider any question of the city's use of the land beyond low-water mark, granted by the act of 1852; for as to that, while, under the act of 1852, there may be a preservation to the upland owner of a pre-emptive right or equity in the made land, no other right exists that would not be effectually destroyed by the paramount right of the city to fill in or otherwise use the land under water, granted by the Dongan charter, if such right inheres in the city.

It has been determined by the courts of this state that, under the Dongan charter and its confirmations, the city of New York acquired an absolute fee to the tideway.    That was clearly held in Furman v. Mayor, etc., of New York, 10 N. Y. 568, and is there stated to be well settled, and to admit of no dispute.    That being so, the city held that land under water precisely in the same way, with the same incidents of ownership, and with the same right to use and dispose of it, as a private individual would have in the real estate of which he stood seised.    In Nott v. Thayer, 2 Bosw. 61, it is stated by the court that it was not disputed by either party that the corporation had an absolute fee in the tideway.    In Towle v. Ramsen, 70 N. Y. 308, it is said that the corporation has an absolute fee in the tideway, and that it necessarily followed that the city had a perfect right to make a grant of the land in fee simple absolute; and in Mayor, etc., of New York v. Hart, 95 N. Y. 443, it is stated that the title of the city to the tideway was, in its origin, absolute, and that the city could sell the strip to whomsoever it pleased.    If such were the nature of the title of the city, the necessary incidents of ownership in fee must follow.    There is nothing in the adjudged cases, and nothing in the terms or history of the grants by royal or state authority, that abridges in any way the title acquired by the city of New York. This absolute ownership of the city is said to be for public purposes. In the case of the Mayor, etc., of New York v. Hart, supra, Judge

Finch says that the Dongan charter gave the tideway for commercial purposes and for the public use; that the city took it as the crown had held it, as trustee for the public; but it is conceded in that case that those owning the upland might have all their rights cut off from the water by reason of the absolute ownership of the city in the tideway, and that the nature of the privileges and conveniences of the upland owner is such that they may lie at the mercy of the sovereign, and may be taken away without compensation. That is so, for the obvious reason that they stand as obstructions in the way of the sovereign's right to benefit the public by necessary and appropriate improvements of the land over which the tide runs; and it is said in the same case that the city, by virtue of its ownership of the tideway, may destroy the privileges and conveniences by a use or grant for public purposes, and without compensation. This conclusion is drawn from the special facts existing in this case.

We do not understand that the case of Rumsey v. Railroad Co., 133 N. Y. 79, 30 N. E. 654, disposes of the question raised here. What is held in that case is that an owner of land on a public river is entitled to compensation for damages sustained by the construction of a railway across his water front, and the deprivation of his access to the navigable part of the stream, unless the owner has granted the right, or it has been taken by the power of eminent domain; and that is all that is there decided.    It brings the law of this state on the general subject of the rights of riparian owners into harmony with the liberal view of such rights taken by courts in other jurisdictions; but there was no question involved between the upland owner and the grantee of the sovereign holding by chartered grants specifically conferring a title and ownership held for two centuries, and defined to be an absolute ownership, which gives complete dominion; and that is the distinctive feature of this case. The right of the city stands upon its charters and grants, and confirmations thereof.    Those charters and grants have been confirmed in their full scope and meaning, as were all royal charters and grants antedating October 14, 1775.    No limitation has been placed upon such grants.    They have been confirmed as they were made.    It is too late for a private person to draw into question the power of King James the Second or King George the Second, by their governors general of the province, to grant, or the power of the legislature of the sovereign state of New York in 1777 to confirm what was granted, to the city of New York, in absolute ownership.    Among the provisions of the Dongan charter (section 14) is one that authorizes the city "at any time or times hereafter when it to them shall seem fit and convenient, take in, fill and make up and lay out all and singular the lands and grants in and about the said city and island Manhattan, and the same to build upon or make use of in any other manner or way as to them shall seem fit, as far into the rivers thereof or that encompass the same as low-water mark aforesaid."    That term of the grant was confirmed with all the rest, and gave the city the right to do just what it has done and is doing, and it was confirmed before any question could arise of the constitutional right of an upland owner to compensation for being deprived of his

riparian rights or easements; and it is not shown by any authority that the royal grant, when made, could not be availed of by the city without making compensation to the upland owner. It is upon the exceptional state of facts arising out of the nature and terms of the grants to the city, their proper construction, and the rights acquired under them, that we think the judgment of the court below was right, and should be affirmed.

VAN BRUNT, P. J., and WILLIAMS and O'BRIEN, JJ., concur.

INGRAHAM, J. (dissenting). In the year 1666 the original Harlem patent was granted by Richard Nicolls, governor of the colony of New York, by which there was granted to the inhabitants and freeholders of Harlem all that tract of land within certain bounds set forth in the charter, which lands were bounded by the "Harlem river, or any part of the said river on which this island doth abut," together with all the soils, creeks, quarries, etc., and "all other profits, commodities, emoluments and other hereditaments belonging to the said lands and premises within the said bounds and limits set forth belonging or in any wise appertaining." This was confirmed by a patent granted by Gov. Dongan dated March 7, 1686. The plaintiff claims title to the upland in question under a grant from the inhabitants and freeholders in Harlem, dated May 2, 1700, by which there is set off for Jan Louwe Boogert a piece of land lying in the bend of Hellgate, which land is bounded by the river, and includes the land in question. See Pirsson's Dutch Grants, 142; Riker's History of Harlem, 491. On September 21, 1706, John Loewsen Bogert and Cornelia, his wife, conveyed this land to Johannes Benson, and in such conveyance this grant from the inhabitants and freeholders of Harlem was recited. This deed is printed at full in Pirsson's Dutch Grants (page 95), and is recorded in the office of the register of the city and county of New York (Liber 226 of Conveyances, at page 37); and from the said Johannes Benson the plaintiff has acquired his title. The defendant, the city of New York, is about to fill up the land under water in front of the plaintiff's premises, thus cutting him off from all access to the river, and destroying all riparian rights that the plaintiff has by virtue of his ownership of this property abutting on the river; and this action is brought to enjoin and restrain the defendant from such action so far as it affects or destroys the property of the plaintiff. The city of New York claims title to the land under water in front of and adjoining the plaintiff's property, under the charter granted by Gov. Dongan, April 26, 1686, which was subsequent to the two patents to the inhabitants and freeholders of Harlem. By the Dongan charter, there was granted to the city of New York "all waste, vacant, unpatented and unappropriated lands lying and being within the said city of New York and on Manhattan Island aforesaid, extending and reaching to the low-water mark in, by and through all parts of the said city of New York and Manhattan Island aforesaid"; and by a subsequent charter, granted by Gov. Montgomerie on the 15th day of January, 1730, this grant was confirmed.

We have thus to consider what riparian rights, if any, the inhabitants and freeholders of Harlem acquired by the patent to them, and that passed from the grant by them to Bogert.   The grant to the city of New York by both the Dongan and Montgomerie charters was the "waste, vacant, unpatented and unappropriated lands"; and I think it clear that the grant to the city of New York was subject to all rights that had been acquired by prior grantees.   This certainly applies to prior grants by the English governors.   The title that was granted to the city of New York by the Dongan and Montgomerie charters to right in the tideway has been several times before the courts of this state, and the title of the city of New York acquired under these charters has been characterized as an absolute fee to the tideway.   See Furman v. Mayor, etc., of New York, 10 N. Y. 568; Towle v. Remsen, 70 N. Y. 308; Mayor, etc., of New York v. Hart, 95 N. Y. 443.   The question, however, as to whether or not there existed a riparian right on lands that had been granted or patented prior to the Dongan charter to the city of New York was not before the court, and was not determined.   In none of the cases cited to us upon the argument was that question presented, and, so far as those decisions apply, it does not appear that any claim was made to the existence of this riparian right; nor was the enforcement of such right at issue.   I cannot find that this question had ever been passed upon by any of the courts of this state.   The city of New York, a municipal corporation, acts in a dual capacity.   This is discussed in Dillon's Municipal Corporations (volume 1, § 66), where the learned author says:

"In its [municipal corporation's] governmental or public character, the corporation is made, by the state, one of its instruments, or the local depositary of certain limited and prescribed political powers, to be exercised for the public good on behalf of the state, rather than for itself. * * * But, in its proprietary or private character, the theory is that the powers are supposed not to be conferred, primarily or chiefly, from considerations connected with the government of the state at large, but for the private advantage of the compact community, which is incorporated as a distinct legal personality or corporate individual."

And this relation of a municipal corporation, and the nature of its interest in property which has been conveyed to or acquired by it, are discussed in the case of Webb v. Mayor, etc., of New York, 64 How. Prac. 16, where the court say:

"I perceive no difference between the tenure of property thus held by the city and the proprietary rights of natural persons or private corporations."

The city of New York, therefore, took this property conveyed by the charters before mentioned in its "proprietary right or private character"; and it became vested with the fee of the property, subject to the same rights of prior patentees that would have existed in case the grant had been made to a private individual or private corporation, instead of the city of New York; and, before this grant of the tideway to the city of New York, there had been granted to the inhabitants and freeholders of Harlem the land abutting on the tideway; and the grant to the city of New York contained in the charters was, it seems to me, subject to the right acquired by the patentees in the Harlem patent.

The first question presented is, what rights were acquired by the patentees of the Harlem patent? There was granted by that patent the land eastward of a certain boundary to the Harlem river, as also to the North and East rivers, together with all the soils, creeks, quarries, etc., and all other profits, commoditites, emoluments, and hereditaments to the lands and premises within the said line belonging or in anywise appertaining, with their and every of their appurtenances. It cannot now, I think, be disputed that such a grant, bounded upon an arm of the sea, vests in the owner of the land thus abutting certain riparian rights, which are well defined, and which are property appurtenant to the land so abutting.

It has been again and again decided that the title of the state to the bed of the rivers and arms of the sea was subject to the riparian right in favor of the owner of the uplands. Hedges v. Railroad Co., 150 N. Y. 156, 44 N. E. 691, and cases cited. And if the state, as successor to the king of England, owns the property under water subject to this right of the owner of the upland, it must follow that the king of England held this property, after his grant to the inhabitants and freeholders of Harlem, subject to these riparian rights that had attached to the uplands granted.

In Yates v. Milwaukee, 10 Wall. 504, the court say:

"But, whether the title of the owner of such a lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and among those rights are access to the navigable part of the river from the front of his lot, the right to make a landing, wharf, or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever those may be. * * * This riparian right is property, and is valuable, and, though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary, that it be taken for the public good, upon due compensation."

And in the case of Illinois Cent. R. Co. v. Illinois, 146 U. S. 446, 13 Sup. Ct. 115, it was held that:

"The riparian right attaches to land on the border of navigable water without any declaration to that effect from the former owner, and its designation in a conveyance by him would be surplusage. The riparian proprietor is entitled, among other rights, as held in Yates v. Milwaukee, supra, to access to the navigable part of the water on the front of which lies his land, and for that purpose to make a landing, wharf, or pier for his own use, or for the use of the public, subject to such general rules and regulations as the legislature may prescribe for the protection of the rights of the public. In the case cited, the court held that this riparian right was property and valuable; and, though it must be enjoyed in due subjection to the rights of the public, it could not be arbitrarily or capriciously impaired."

This case of Yates v. Milwaukee, supra, is cited with approval as determining the question respecting the rights of riparian owners by the court of appeals in Rumsey v. Railroad Co., 133 N. Y. 87, 30 N. E. 654.

In the case of Duke of Buccleuch v. Board, L. R. 5 H. L. 462, Lord Cairns defines most concisely what is meant by riparian property. He says:

"It has appeared to me throughout that the property of the plaintiff in error in this case was what is commonly called 'riparian property.' The meaning of that is that it had a water frontage. The meaning of its having a water frontage was this:

that it had a right to the undisturbed flow of the river, which passed along the whole frontage of the property in the form in which it had formerly been accustomed to pass. * * * Beyond all doubt, the water right was a property belonging to the plaintiff, for which compensation was to be made."

And in the case of Saunders v. Railroad Co., 144 N. Y. 87, 38 N. E. 992, it was held that the defendant's patent from the state "was valid and effectual to vest it with all the rights that the state had in the parcel in question, but it could not extinguish or impair the easement or riparian rights which the plaintiffs or their grantors had as owners of the uplands and bank of the river." The court then proceeded to define what these rights are:

"They embrace the right of access to the channel or navigable part of the river for navigation, fishing, and such other uses as commonly belong to riparian ownership, the right to make a landing, wharf, or pier for his own use, or for that of the public, with the right of passage to and from the same with reasonable safety and convenience."

In the case of Van Dolsen v. Mayor, etc., of New York, 21 Blatchf. 455, 17 Fed. 817, the title of the defendant, the mayor of the city of New York, derived under the Dongan charter, was before the court, and this exact question seems to have been decided. It seems that in that case the plaintiff claimed title, under a grant dated 1676, of a tract of land bounded southeast by the river, and, in 1677, the grant of another tract adjoining this, bounded "by ye water side." These grants being before the Dongan charter, it was held that the title of the city was subject to the riparian rights of the first grantee; and the court held that the crown of Great Britain, "after Magna Charta, could not grant land bounded on a way, and afterwards, without compensation, remove the way, any more than an individual could"; that the defendants, as grantees from and under the crown, are limited as if they had made the grant which the crown made. It was held that the defendants could not, without making compensation, so use the land granted to them by the Dongan charter as would seriously interfere with the riparian rights vested in the owner of the upland. The same principle has been expressly applied by the court of appeals in the two cases before cited. Rumsey v. Railroad Co.; Saunders v. Railroad Co. In each of those cases the court expressly held that the owner of land abutting upon the arm of the sea or navigable stream had a riparian right as appurtenant to his abutting lands; that such right was property; and that neither the state nor the grantee of the state could use that property without making compensation.

It is conceded in this case that the city of New York, as the owner of the tideway in front of the plaintiff's property, is about to fill up that land, and use it for its own purposes, and that this will, in effect, destroy the plaintiff's riparian right appurtenant to his property. The city has acquired by various patents and grants, from the crown before the Revolution, and from the state since, the fee of the land under water for a considerable distance into the river; and it claims the right to use the property thus acquired, so that, when filled up, the plaintiff's property will be entirely cut off from all access to the river in any way. It is clear that, if plaintiff has a riparian right as appurtenant to his property, it is appropriated and

destroyed by the use to which the city proposes to put the property acquired by it between the bulkhead line and high-water mark. The only question that there can be, therefore, is whether or not the inhabitants and freeholders of Harlem acquired such riparian right as appurtenant to the property granted to them, and whether the subsequent grant of the tideway by the Dongan and Montgomerie charters to the city of New York was, subject to this right acquired by the inhabitants and freeholders of Harlem under its patent. By the grant to the inhabitants and freeholders of Harlem, the title to the land embraced within the boundaries contained in the grant vested in the grantees; and, with the title to the upland, there vested the riparian rights, as part of the land granted. This right in no way depended upon prescription or a presumed grant of the crown. It passed as a part of the land granted, and was as much property as the land itself within the prescribed bounds.

Thus, it was said by Lord Wensleydale in the house of lords, in Chasemore v. Richards, 7 H. L. Cas. 382:

"It has been now settled that the right to the enjoyment of a natural stream of water on the surface, ex jure naturæ, belongs to the proprietor of the adjoining lands, as a natural incident to the right to the soil itself, and that he is entitled to the benefit of it, as he is to all the other natural advantages belonging to the land of which he is the owner. He has the right to have it come to him in its natural state, in flow, quantity, and quality, and to go from him without obstruction, upon the same principle that he is entitled to the support of his neighbor's soil for his own in its natural state. His right in no way depends upon prescription, or the presumed grant of his neighbor."

And it was said by Lord Selborne in Lyon v. Fishmongers' Co., 1 App. Cas. p. 682:

"But the rights of the riparian proprietor, so far as they relate to any natural stream, exist jure naturæ, because his land has, by nature, the advantage of being washed by the stream; and, if the facts of nature constitute the foundation of the right, I am unable to see why the law should not recognize and follow the course of nature in every part of the same stream."

Thus, by the law of England which applied when these charters and grants were executed, the grant by the crown to the inhabitants and freeholders of Harlem granted to them this riparian right as part of the property itself granted. This riparian right was entirely distinct and separate from the fee of the land under water below high-water mark; and, at the time of the grant to the city of New York by the charters before mentioned, this right of property existed and was owned by the inhabitants and freeholders of Harlem. The grant to the city of New York by the Dongan charter granted and conveyed to it "all the waste, vacant, unpatented and unappropriated lands lying and being within the said city of New York and on Manhattan Island aforesaid, extending and reaching to the low-water mark in, by and through all parts of the said city of New York and Manhattan Island aforesaid." It is conceded that this grant did not apply to the uplands within the boundaries of the land conveyed to the inhabitants and freeholders of Harlem by the prior grant. It is also conceded that it applied to the fee of the land between high and low water, the fee of that land vesting in the city of New York. But what passed with the grant of that fee of land under water?

In Lyon v. Fishmongers' Co., 1 App. Cas., at page 683, Lord Selborne says:

"With respect to the ownership of the bed of the river, this cannot be the natural foundation of riparian rights, properly so called, because the word 'riparian' is relative to the bank, and not the bed, of the stream; and the connection, when it exists, of property on the bank with property in the bed of the stream, depends, not upon nature, but on grant or presumption of law. * * * The title to the soil constituting the bed of a river does not carry with it any exclusive right of property in the running water of the stream, which can only be appropriated by severance, and which may be lawfully so appropriated by every one having a right of access to it. It is, of course, necessary for the existence of a riparian right that the land should be in contact with the flow of the stream; but lateral contact is as good, jure naturæ, as vertical; and not only the word 'riparian,' but the best authorities, such as Miner v. Gilmour, 12 Moore, P. C. 131, and the passage which one of your lordships has read from Lord Wensleydale's judgment in Chasemore v. Richards, 7 H. L. Cas. 349, state the doctrine in terms which point to lateral contact, rather than vertical. It is true that the bank of a tidal river, of which the foreshore is left bare at low water, is not always in contact with the flow of the stream; but it is in such contact for a great part of every day, in the ordinary and regular course of nature, which is an amply sufficient foundation for a natural riparian right."

In Gould on Waters (page 360, § 204) it is said:

"The right to the use of the water in its natural flow is not a mere easement or appurtenance, but is inseparably annexed to the soil itself. It does not depend upon user, or presumed grant from long acquiescence on the part of other riparian proprietors above and below, but exists jure naturæ, as parcel of the land. It is not suspended or destroyed by mere nonuser, although it may be extinguished by the long-continued, adverse enjoyment of others. It is not affected by the use to which the water has been or may be applied; nor is it impaired by unity of possession and title in such land with the land above or below it. It is a natural right, which arises immediately with every new division or severance of the ownership. 'If,' says Chief Justice Shaw in Cary v. Daniels, 8 Metc. [Mass.] 466, 'the owner of a large tract through which a water course passes should sell parcels above and below his own land retained, each grantee would take his parcel with a full right, without special words, to the use of the water flowing on his own land as parcel, and subject to the right of all other riparian proprietors to have the water flow to and from such parcel. There is no occasion, therefore, for the grantor, in such case, to convey the right of water to the grantee, or reserve the right of water to himself, in express words, because, being inseparable from the land and parcel of the estate, such right passes with that which is conveyed, and remains with that which is retained.' "

We thus see that, by the grant to the inhabitants and freeholders of Harlem, this riparian right as property vested in the grantees, and this riparian right as part of the upland which was included in the grant, was not waste, vacant, unpatented, and unappropriated lands lying upon Manhattan Island. The mere grant of the fee of the land under water did not, under the authorities above cited, convey a riparian right to the city of New York, where the upland adjacent to such land under water had been granted to others, so that the grant to the city of New York did not convey the upland; nor did such grant of the land below water, under the principle applied in the cases cited, convey to the city of New York any riparian right as relating to such land under water not connected with adjacent uplands. The city of New York owns the land under water in fee. It can sell this land, occupy it, do with it what it pleases. The plaintiff is not entitled to interfere with this right. The plaintiff, however, owns a riparian right not appertaining to the land under water, but as a part of the upland; and this riparian right was property

vested in the plaintiff, which neither the defendant nor any one else could appropriate or destroy without paying compensation therefor. The city is about to destroy this riparian right, the plaintiff's property; and I can see no reason why the plaintiff should not have the right to a judgment to prevent this illegal destruction of his property.

It is unnecessary to consider whether Magna Charta applied to the colonies, and whether the king's power to dispose of this property absolutely was limited by the fact that a prior grant of it had been made. The king had granted all his rights to this land to the Duke of York. The Duke of York thus owned both the land above and below high water. He granted this upland to the inhabitants and freeholders of Harlem, and his subsequent grant to the city of New York was subject to that right. Nothing in the grant to the city of New York indicates an intention to affect the prior grant. On the contrary, it is only unpatented and unappropriated land which is granted to the city of New York; and this riparian right as property vesting in a former grantee from the king certainly was not included within a grant of waste, vacant, unpatented, and unappropriated lands lying within certain general boundaries. I think, therefore, that the plaintiff had a riparian right which was property, and which the defendant was proceeding to deprive him of without compensation, and that, to the extent necessary to protect that right, he was entitled to judgment.

I agree with the court below as to the other questions decided, but think, for the reason above stated, that the judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.